LakeCounty

Peter E. Kolb
Director

650 W. Winchester Road
Libertyville, Illinois 60048
Phone 847-377-7500
Fax 847-377-7173

May 12, 2008

Mr. Chris Donovan, President
Citizens For An Equitable Water Solution (CFEWS)
9 Croydon Road
Hawthorn Woods, IL 60047

Dear Mr. Donovan:

I received your letter dated April 24, 2008.  Since you have been directly involved as a resident representative since at least the September 19, 2006 public meeting, relating to the required replacement of the Hawthorn Woods-Glennshire (HWG) water system, your April 24, 2008 inquiry is surprising and disconcerting.

As everyone at the September 19, 2006 public meeting was advised, the HWG water system, permitted by the Village, was never constructed to public water system standards. Therefore, the 1975 contract, by which the County took over the water system from the Village, provided that any upgrades to the system shall be paid from local revenues of the HWG system.  As HWG residents will pay for the new Code-compliant public water system, CFEWS representatives, including yourself, were included as members of the Technical Committee formed in the Fall 2006, to research and select the available, most cost-efficient options, for replacement of the HWG water system.

All cost estimates, since the January 2007 Technical Committee report, have specified the individual HWG residence water bill surcharge amount, for each proposed HWG water system replacement option.

To your inquiry "will Lake County use Public Works funds to pay for the improvements to the (HWG) water system", the answer is "no", except as specified in the February 13, 2007 Lake County Board Resolution, by which the County Board committed to contribute $1 million towards the costs of the abandonment of the current water system and replacement of that system with a Code-compliant public water system, conditioned upon the Village first issuing all permits required to construct said new public water system.

So, in essence you have had the answer to your inquiry for over 1 ½ years, and at each of the 3 preference surveys of HWG residents conducted during calendar year 2007.

Sincerely,

LAKE COUNTY PUBLIC WORKS DEPARTMENT

Peter E. Kolb, P.E.
Director

C: James Bassett, Village Administrator, Hawthorn Woods
   Barry Burton, County Administrator
   James C. Bakk, Special Counsel

Ex. C

IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* LISA )
MADIGAN, Attorney General of the State of Illinois, )
 )
     Plaintiff, )
 ·vs. )
 ) Gen. No. 06 CH 2569
COUNTY OF LAKE, a body politic and corporate of the )
State of Illinois, )
 )
    Defendant/Third-Party Plaintiff, )
 vs. )
 ) 06-18-08P12:11 FILE
VILLAGE OF HAWTHORN WOODS, an Illinois )
municipal corporation, )
 )
     Third-Party Defendant. )

## COUNTY OF LAKE THIRD-PARTY COMPLAINT
## AGAINST VILLAGE OF HAWTHORN WOODS

NOW COMES Third-Party Plaintiff COUNTY OF LAKE, by State's Attorney

Michael J. Waller, through Special Assistant State's Attorney James C. Bakk and Assistant

State's Attorney Daniel L. Jasica, and complaining against Third-Party Defendant VILLAGE

OF HAWTHORN WOODS, states as follows:

 1. Third-Party Plaintiff COUNTY OF LAKE (hereinafter "County") is an Illinois

county, a body politic and corporate, organized and existing under the laws of the State of

Illinois.

 2. Third-Party Defendant VILLAGE OF HAWTHORN WOODS (hereinafter

"Village") is an Illinois municipal corporation, organized and existing under the laws of the

State of Illinois, and located in Lake County, Illinois.

 3. That on or about October 21, 1975, in Lake County, Illinois, the Village and the

County entered into a written agreement (hereinafter "1975 Contract"), by which the Village

1



transferred operation and ownership of a water supply system to the County, which water system is located entirely within the corporate limits of the Village, and serves residences lying within certain areas of the Village known as the Hawthorn Woods-Glennshire area ("HWG area"). A true and correct copy of that 1975 Contract, and the adopting County Board Resolution, is attached and marked Exhibit A and incorporated by reference.

**Background Facts**

4. The Hawthorn Woods-Glennshire water system ("HWG WS") was permitted by the Village, and constructed, from 1954 to 1962. The HWG WS serves 224 residences in the HWG area.

5. The HWG WS was not constructed to public water system standards. The HWG WS consisted of 20 individual wells, with water distribution piping measuring 1 ½ inches or 2 inches in diameter. Water storage was/is provided by hydroneumatic tanks, located in below ground pits. The wells, storage facilities, and distribution piping are located mainly on private property, in the backyards or frontyards of residences.

6. In 1975, according to the Village President, the Village sold the HWG WS to the County because the Village could not afford to operate a public water system in compliance with IEPA standards. (A true and correct copy of Village President R.L.W. Luedtke's March 28, 1980 letter, with HWG area resident survey results, is attached as Exhibit B and incorporated by reference.)

7. The 1975 Contract between the Village and the County provides that "(t)he County will from time to time issue revenue bonds to expand and improve the water supply facilities. Said revenue bonds shall be retired by funds derived from the local system." (Exhibit A, 1975 Contract, §6).

8. The 1975 Contract also provides that "(t)he Village agrees to give the County the right to use the streets or other public easements for the installation and maintenance of said water system ..." (Exhibit A, 1975 Contract §1).

9. In 1980, because the HWG WS was not in compliance with IEPA rules and regulations, representatives of the County met with the Village Board to explore the available funding alternatives under the 1975 Contract, to either rehabilitate or reconstruct the HWG WS. Following a survey of HWG area water system users, the Village Board determined that the Village would not become involved A true and correct copy of the May 23, 1980 Galantha (County) to Lindstrom (IEPA) letter, with March 28, 1980 and May 10, 1980 Village letters is attached and marked Group Exhibit C and incorporated by reference.

10. As a result, with no local revenue funding source, the County was unable to and made no upgrades to the HWG WS. The County has continuously operated, maintained, and repaired the HWG WS, as needed, with in-kind replacement.

11. By a letter dated April 4, 2005, the IEPA provided to the County a Notice of HWG WS deficiencies, together with an IEPA engineering evaluation of the HWG WS. (A true and correct copy of that April 4, 2005 Notice and evaluation is attached and marked Exhibit D and incorporated by reference.) Included among the HWG WS deficiencies identified were below ground water storage facilities, inadequate water storage capacity, 1 inch and 2 inch diameter water distribution mains (4 inch diameter is current minimum), and failure to meet the fluoride and chlorine residuals in distributed water.

12. Thereafter, in 2005 and in 2006 the IEPA cited the HWG WS for violation of IEPA drinking water chlorination regulations, and served notices of violation on the County as operator and owner of the HWG WS. The IEPA also advised the County that no permits

3

would henceforth be issued for in-kind replacements (i.e. replacing a failed 2 inch water distribution main with a 2 inch water distribution main) to the HWG WS.

13. The County applied to the IEPA for a permit to install interim chlorination facilities on the HWG WS, which permit was issued by the IEPA. The County then installed the interim chlorination facilities on the HWG WS, and, as a result, the earlier chlorine residual violations of IEPA regulations have been (temporarily) remedied.

14. Following notice to the Village and HWG area residents, a public meeting was held in Hawthorn Woods on September 19, 2006 to advise and discuss the need (and IEPA demand) to replace the HWG WS, the options available for replacement of the 50+ years old HWG WS, and the costs involved regarding those replacement options. That September 19, 2006 public meeting was attended by a large number of HWG area residents, Village officials, County officials, and officials from Aqua Illinois, a public utility providing water service in other areas of the Village.

15. Following that September 19, 2006 public meeting, a Technical Advisory Committee (TAC) was formed to investigate and report back on the options available for replacement of the HWG WS and the costs involved for any identified option. Membership on that Technical Committee included HWG area resident representatives (who dubbed themselves CFEWS – Citizens For an Equitable Water System), County engineers and officials, an Aqua Illinois official, and the Village Administrator and Village engineer.

16. The Illinois Attorney General filed the subject People ex rel. Madigan v. County of Lake, 06 CH 2569, IEPA enforcement lawsuit on November 30, 2006.

17. In January 2007 the TAC issued a written report that advised of the options identified by the TAC as available to replace the HWG WS and the estimated costs (per residence) of each option. [The three identified options included:

(1) the HWG WS is abandoned, and each of the 224 residences drills their own private well;

(2) a County-owned and operated public WS option, with 4 inch water mains without fire-suppression ("County option"), financed by County issued revenue bonds secured by a surcharge to HWG area users bills; and (3) an Aqua Illinois operated, Village-owned, public WS option, with 8 inch water mains with fire-suppression (Aqua option), financed by a Village Special Service Area special assessment.

18. On February 13, 2007 the Lake County Board approved and passed a Resolution which committed a $1 million contribution toward the overall costs of abandonment of the old WS, designing, obtaining approvals for, constructing, and making operational, a new public WS for the HWG area, which Resolution was contingent on the Village first issuing all local permits and approvals required for the construction of either such public water system option.

19. In February 2007 an HWG area resident preference survey (Survey 1) was conducted. In the last week of February 2007, before the results of Survey 1 were tabulated, the Village Mayor advised that he had obtained certain recapture fee waivers which would lower the cost estimate of the Aqua option, and the Village Mayor asked that a second survey be conducted with inclusion of this new (recapture fee waiver) information in the Aqua option cost estimate.

20. The new information was distributed through the TAC to HWG area residents, and a second resident preference survey (Survey 2) was conducted in April 2007. The

results of that Survey 2 were that the overwhelming majority (79%) of HWG area residents who voted preferred the County option.

21. Shortly thereafter, on May 8, 2007 the Lake County Board approved and passed a Resolution which authorized proceeding under the HWG area resident-preferred County option, and authorized retention of a design engineering firm and directed proceeding with design of a new public WS and acquisition of real estate. A copy of this May 8, 2007 Resolution was mailed to the Village Board on May 10, 2007. A true and correct copy of the referenced May 10, 2007 letter and May 8, 2007 Resolution are attached and marked Exhibit E and incorporated by reference.

22. The County option required the acquisition of real estate to site a Well House and Water Reservoir structure, in or in close proximity to the HWG area. In June and July 2007, County representatives identified 3 different parcels in unincorporated Lake County, each of which was suitable, and proximate enough, to site a Well House and Water Reservoir for the HWG WS. The County made offers to purchase on each of those three unincorporated parcels, and each time the owner(s) refused. Thereafter, available parcels within the Village, in the HWG area, were reviewed and on August 13, 2007 a Contract to Purchase the parcel commonly known as 107 Old McHenry Road, Hawthorn Woods, lying within the HWG area, was entered into by the County.

23. On September 20, 2007, with preliminary engineering design of the new public WS complete, the County applied to the Village for a Special Use Permit and yard setback variations, to site the Well House and Water Reservoir at 107 Old McHenry Road. The County's Application was scheduled for a November 7, 2007 public hearing.

24. On October 5, 2007 the Village removed the County Application from the November 7, 2007 public hearing schedule. By a letter dated October 9, 2007 to the Village Clerk, one of the County's attorneys requested that the County's Application be returned to the November 7, 2007 public hearing schedule and explained the reasons for the request. (A true and correct copy of that October 9, 2007 County attorney letter is attached and marked Exhibit F and incorporated by reference.) On October 9, 2007, that same day, the Village refused to return the County Application for Special Use Permit to the November 7, 2007 public hearing schedule. (A true and correct copy of the October 9, 2007 Village Mayor refusal Email is attached and marked Exhibit G and incorporated by reference.) In addition, on October 9, 2007 the Village engineer advised the County's engineer that the County's Application for Special Use Permit would not be considered complete until an IEPA issued permit for the project was submitted with the Application.

25. On October 31, 2007 the County, by a letter signed by the County Board Chair and the County's Public Works & Transportation Committee Chair, sent to the Village Mayor and Village Trustees a request that the Village, at its November 26, 2007 Village Board meeting make an official determination as to which public WS replacement option would be supported by, and acted upon favorably by, the Village. (A true and correct copy of the County October 31, 2007 letter to the Village is attached and marked Exhibit H and incorporated by reference.) The Village Board failed or refused to act on that request, and continues to fail or refuse to act.

26. On November 16, 2007, at a meeting requested by the Attorney General's office, the Village Mayor advised the Attorney General's office and County counsel that cost savings in the HWG WS project could be realized by buying water in bulk from Aqua

Illinois, as compared with the County building a Well House and Water Reservoir on 107 Old McHenry Road. The Village Mayor insisted that a third HWG area resident preference survey be conducted. The Village Mayor represented to the Attorney General's office that the results of a third survey would be accepted by the Village. The Village Mayor also insisted that the County Board also act again to advise the Village and HWG area residents that the February 13, 2007 resolution authorizing a contribution of $1 million towards the abandonment of the old WS and construction of a new public WS was still in effect even if, either a County hybrid option (with a County operated and owned (4 inch water main) system with water purchased in bulk from Aqua Illinois), or a Village hybrid option (with a Village operated and owned (8 inch water main) system with water purchased in bulk from Aqua Illinois, was preferred by the HWG area residents.

27. On December 5, 2007 the Public Works & Transportation (PW&Tr.) Committee of the Lake County Board approved and passed a Resolution (a true and correct copy of which Resolution is attached and marked Exhibit I and incorporated by reference), which reaffirmed the County's $1 million contribution if either the County-Aqua hybrid option or the Village-Aqua hybrid option was preferred by HWG area residents. That PW&Tr. Committee Resolution also again asked the Village Board to advise which public WS option was acceptable to, and would be promptly approved by, the Village. The Village Board failed or refused, and continues to fail or refuse, to respond to the PW&Tr. Committee inquiry regarding which public WS option is acceptable to the Village.

28. Thereafter, on December 10, 2007 a public meeting for HWG area residents was hosted by the Village and the County to advise residents of the new public WS replacement

8

options; the estimated costs for each option; and, that a third survey (Survey 3) would be conducted.

29.  In late December 2007 and early January 2008, Survey 3 of HWG area residents was conducted.  (A true and correct copy of one of the Survey 3 ballots is attached and marked Exhibit J and incorporated by reference.)  The results of that Survey 3 were again an overwhelming (85%) preference for the County-Aqua hybrid option.

30.  By a letter dated January 10, 2008, the County's Public Works Director advised the Village Mayor and Village Trustees of the results of Survey 3, and he also requested that an authorized representative of the Village acknowledge that the County-Aqua hybrid option was acceptable to the Village, by signing at the bottom of his January 10, 2008 letter and returning that signed letter to him by January 31, 2008.  (A true and correct copy of that January 10, 2008 letter is attached and marked Exhibit K and incorporated by reference.)  The Village failed or refused to sign the acknowledgment, and continues to fail or refuse to acknowledge that the County-Aqua hybrid option is acceptable to the Village.

31.  Pursuant to the direction in the County Board's December 13, 2007 Resolution, the County engineers proceeded to revise preliminary design drawings for the HWG WS to reflect the HWG area resident preferred (in Survey 3) County-Aqua hybrid option.  And, on February 4, 2008 the County submitted a letter to the Village, withdrawing the September 20, 2007 Application for Special Use Permit, and submitting in its place an Application for Permit, with 6 sets of plans, to locate the water distribution system in public rights-of-way.  (A true and correct copy of the February 4, 2008 cover letter is attached and marked Exhibit L and incorporated by reference.)  The Village has failed or refused to act on that February 4,

2008 County Application for Permit, and continues to fail or refuse to act on said Application.

32. On February 25, 2008, at a meeting requested by the Village Mayor with the Village engineer, and with the County's Public Works Director Peter Kolb, on a draft County-Hawthorn Woods Wholesale Sewage Treatment and Disposal Agreement ("Sewage Contract"), for treatment of Village sanitary sewage at the County's Des Plaines WWTP, which draft Sewage Contract Mr. Kolb had given to the Mayor and Village back on March 20, 2007, the Village Mayor advised Mr. Kolb that no Village permits would be issued for the HWG WS project, unless Mr. Kolb first signed off on a Village sanitary sewer interceptor construction project tributary to the County's WWTP, even though the Village Board had failed or refused to act on the Sewer Contract.[1]

33. On February 29, 2008 the Village engineer sent comments on the County's February 4, 2008 Application for Permit to the County, which advised for the first time that there was a Village Fire Ordinance that required water main size to be a minimum 8 inches diameter, and that the County would therefore need to apply to the Village Board for a variance from that ordinance.

34. On April 10, 2008 the County applied to the Village for a variance from the 8 inches minimum diameter size Village ordinance requirement, to allow installation of the HWG area resident preferred County-Aqua hybrid option 4 inches diameter water mains. (A true and correct copy of that April 10, 2008 letter is attached and marked Exhibit M and incorporated by reference.) The Village has failed or refused to act on that variance

---

[1] The next day, on February 26, 2008, the Village emailed to Mr. Kolb comments and suggested revisions to the Sewer Contract made by the Village attorney on October 11, 2007 and by the Village engineer on October 12, 2007.

application, or failed to schedule the variance for a public hearing, if required, and the

Village continues to fail or refuse to act on the County's variance application.

35. As a result of the Village insistence that water be purchased from Aqua Illinois

under the County-Aqua hybrid option, which leaves the HWG WS without any storage

facilities, and because Aqua requests that any water purchaser enforce a water restriction

ordinance, and because the Village insists on imposing an additional expense of a $2,000 per

residence Village public water system connection fee as a part of the project cost, a three-

party bulk water purchase agreement between Aqua, the County, and the Village was

required, and is also required as a part of the IEPA permitting (identification of approved

water supplier) of the HWG WS project. On April 25, 2008 the County provided Aqua and

the Village with a revised three-party Bulk Water Agreement, requesting review and

comments from the Village and Aqua. Aqua has responded with comments and some

revisions, which were forwarded to the Village. The Village has failed or refused to provide

any response or to act on the required Bulk Water Agreement, and continues to fail or refuse

to respond or to act.

36. On May 29, 2008 certain HWG area residents filed a lawsuit against the County

in federal court, purportedly as a class action, entitled, Donovan, et al. v. County of Lake, 08

CV 3098, which seeks *inter alia* a judicial order that the County, and not HWG area

residents, pay for the HWG area new public WS, and also that the County pay the legal costs

for the residents' attorneys to sue the County.


## COUNT I
### Specific Performance or No Village Permit Required

37-72.  Third-Party Plaintiff County adopts as if fully set forth herein Paragraphs 1-36 above as Paragraphs 37 – 72 of this Count I.

73.  In 1975, when the County took over operation and ownership of the HWG WS from the Village, the HWG WS did not meet public water system standards.

74.  The 1975 Contract provides that the County agreed "to make the necessary improvements to the water system as may be required by the Illinois E.P.A." (Exhibit A, 1975 Contract §2).

75.  The 1975 Contract also provides that "(t)he Village agrees to give the County the right to use the streets and public easements for the installation and maintenance of said water system …" (Exhibit A, 1975 Contract §1, last Paragraph).

76.  In the underlying action, People ex rel. Madigan v. County of Lake, 06 CH 2569, the Illinois IEPA, through the Illinois Attorney General, seeks injunctive relief and civil penalties to force the final and permanent abatement of the alleged violation of IEPA rules and regulations, relating to the HWG WS (i.e. the replacement of the current non-compliant HWG WS).

77.  In conformance with its obligations under the 1975 Contract with the Village, the County retained design engineers to design a new Code-compliant public WS for installation in the HWG area.   Plans and reviewable design engineering drawings for a new Code-compliant public WS were completed, and the County submitted an Application for Special Use Permit and Variations to the Village on September 20, 2007. The Village failed or refused to review or to approve that September 20, 2007 County submittal.

78.  Following a third survey of HWG area residents (Survey 3), the County's design engineers revised the plans and design of the new Code-compliant public water system for

12

the HWG area, and on February 5, 2008 submitted to the Village complete plans and

drawings, along with an Application for Permit, to site the new Code-compliant public water

system in the Village rights-of-way or public easements, in accordance with the 1975

Contract between the Village and the County.

79.  On February 25, 2008 the Village Mayor verbally advised the County's Public

Works Director that no Village permit would issue for the HWG WS (on the February 5,

2008 Application), unless the County first signed off on a Village sanitary sewer interceptor

IEPA application and withdrew a pending County motion in a Village IEPA proceeding

concerning a FPA (Facilities Planning Area) amendment request.  Neither the Village

sanitary sewer interceptor IEPA permit matter, nor the Village IEPA FPA amendment

request, has any relation to the subject HWG WS.

80.  On February 29, 2008 the Village engineer advised the County, for the first time,

that the 4 inches diameter water distribution mains contained in the submitted February 5,

2008 plans and drawings, did not comply with a Village Fire Ordinance that required 8

inches diameter minimum water mains.  The Village engineer advised the County that the

County would therefore need to apply for a variance to the Village Board from the Village

Fire Ordinance.

81.  In the January 2007 HWG WS Technical Advisory Committee (TAC) report, on

which Technical Committee both the Village engineer and Village Administrator were

members, and in each of the 3 HWG area resident preference surveys conducted in calendar

year 2007, the County option, or County-Aqua hybrid option, was always identified as

having 4 inches diameter water distribution mains.  The Village engineer, and the Village,

failed to disclose or concealed the Village Fire Ordinance and its Village rule that water mains be 8 inches diameter minimum.

82. On April 10, 2008 the County submitted to the Village a variation request, seeking a waiver of the Village Fire Ordinance 8 inches diameter minimum water main size requirement.

83. In breach of its obligations under the 1975 Contract to give the County the right to use Village streets and public easements, the Village has failed or refused to act on either the County's February 5, 2008 Right-of-Way Application for Permit or the County's April 10, 2008 request for variation from the Village Fire Ordinance rule that water mains be 8 inches diameter minimum.

84. In further breach of the 1975 Contract, the Village Mayor made the performance of certain acts by the County, on unrelated matters, a precondition to the Village acting on the above described HWG WS applications by the County. The Village fails and refuses to, and continues to fail and refuse, to perform its obligations under the 1975 Contract.

85. That the HWG WS plans and engineering drawings, submitted to the Village on February 5, 2008, have been approved for construction by the IEPA, subject only to there being a signed agreement with the water supplier (Aqua Illinois).

86. The County is ready, willing, and able, to construct and install the new Code-compliant HWG WS, with 4 inches diameter water distribution mains, under the terms and conditions of the 1975 Contract.

87. The County has made applications to the Village in conformance with Village ordinances, and the County has made reasonable attempts to comply with Village ordinances.

88. The Village has failed and refused, and continues to fail and refuse, to act on the County's applications for Village approvals and permits. And, in furtherance of the Village Mayor's refusal to process any County HWG WS permit application unless County action on unrelated matters is first performed, the Village has, and continues to, refuse to approve and permit the HWG WS, as has been approved by the State IEPA.

89. That by reason of the Village failures to act in accordance with the 1975 Contract, the County has no plain and adequate legal remedy to the continued and purposeful Village delays and refusals to permit installation of a Code-compliant public water system in the HWG area.

90. That the Village failure or refusal to act compromises the ability of the County to operate a safe public water supply, in compliance with State regulations, and may subject the County to additional civil penalties solely because of the failure or refusal to act by the Village.

WHEREFORE, Third-Party Plaintiff COUNTY OF LAKE prays that this Court enter a judgment in its favor and against Third-Party Defendant VILLAGE OF HAWTHORN WOODS,

(a) ordering the Village to specifically perform under the 1975 Contract by issuing a permit to the County to install the IEPA-approved HWG WS, with 4 inches diameter water distribution mains, in the Village rights-of-way and public easements; or

(b) If specific performance cannot be granted, that the Court enter an Order determining that the County has made reasonable attempts to comply with Village ordinances, but that the Village has unreasonably failed or refused to issue local approvals, in conformance with the terms of the 1975 Contract between the County and the Village, and

that therefore no Village approvals are required to be obtained by the County to construct and

install and make operational the Code-compliant HWG public WS as approved by the

Illinois EPA;

(c) and, for Third-Party Plaintiff's costs of this action; or for such other or different

relief as the Court deems just and equitable under the circumstances.


## COUNT II
### Breach of Contract – Refusal to Issue R-O-W Permit

91-144.  Third-Party Plaintiff County adopts as if fully set forth herein Paragraphs 37-

90 of Count I above as Paragraphs 91 – 144 of this Count II.

145.  That the County has performed all terms and conditions under the 1975

Contract required of the County, to the extent that the County has been permitted to do so by

the Village.

146.  That as a proximate result of the Village failure to perform the 1975 Contract

according to its terms, the County has been damaged, or will be damaged, in the following:

> (a)  the costs and expenses of retained engineers and consultants incurred in
> preparation of the HWG WS design plans and drawings for the September
> 20, 2007 submittal to the Village, which costs and expenses are in an
> amount in excess of $50,000;

> (b)  the costs and expenses of retained engineers and consultants incurred in
> preparation of the revised HWG WS design plans and drawings for the
> February 5, 2008 Right-of-Way Application for Permit and April 10, 2008
> Variation request to the Village, which costs and expenses are in excess of
> $50,000;

> (c)  the Reimbursement Fees imposed by the Village on the County, relating
> to the Village review of the September 20, 2007, February 5, 2008, and April
> 10, 2008 County submittals, which Village fees exceed $8,400.00;

(d) any and all County costs and expenses relating to land acquisition and real estate contract(s) for the September 20, 2007 HWG WS design and plans, which had to be terminated, which costs and expenses were in excess of $10,000,

(e) any and all costs and expenses relating to upsizing the water distribution mains, if required, from the IEPA-approved 4 inches to the Village ordinance 8 inches;

(f) the salary costs, and related expenses, of County Public Works Department staff relating to the HWG WS replacement designs, plans, and drawings for the September 20, 2007, February 5, 2008, and April 10, 2008 submittals to the Village, which costs and related expenses exceeds $50,000; and

(g) any penalties imposed in the underlying State IEPA enforcement action, attributable to the delays in making an HWG WS replacement Code-compliant water system operational, occasioned by the Village acts or omissions under the 1975 Contract.

WHEREFORE, Third-Party Plaintiff COUNTY OF LAKE prays that this Court enter a judgment in its favor and against Third-Party Defendant VILLAGE OF HAWTHORN WOODS, in an amount in excess of $50,000, to be determined by the Court in accordance with the proofs; for Third-Party Plaintiff's costs of this action; and, for such other or different relief as the Court deems just and equitable under the circumstances.

## COUNT III
### Anticipatory Breach of 1975 Contract – Refusal to Fund New HWG WS

147-202. Third-Party Plaintiff County adopts as if fully set forth herein Paragraphs 91-146 of Count II above as Paragraphs 147 – 202 of this Count III.

203. That prior to the 1975 Contract, the Village was the municipal governmental entity that issued permits which resulted in the creation of the HWG WS that did not meet public water system standards. The Village operated and owned that HWG WS prior to the inception of the 1975 Contract.

204. As a party to the 1975 Contract, the Village was representing itself, as a municipal entity operating a public water system, as well as the Village residents who were HWG area customers of that HWG WS.

205. The 1975 Contract provides that, if improvement is made to the HWG WS, that revenue bonds issued by the County "shall be retired by revenues derived from the local System." (Exhibit A, §6).

206. Since formation of the HWG area TAC in late 2006 to investigate available options to replace the HWG WS, the County has continuously advised both the Village, and HWG area residents, that a County-owned and operated new HWG WS would be constructed using subordinate revenue bonds, secured by a surcharge on HWG WS user bills. This subordinate revenue bond financing is the one way that the County, as operator and owner of the HWG WS, can retire revenue bonds from funds derived from the local HWG WS, as is contemplated by the 1975 Contract.

207. Other legal mechanisms are available to the Village to retire revenue bonds from funds derived from the local System, which lies entirely within the municipal boundaries of the Village (such as by a Village Special Service Area).

207. That in compliance with the terms of the 1975 Contract, the County has prepared to issue subordinate revenue bonds, secured by a surcharge on HWG WS bills, which would retire the revenue bonds from funds derived from the local System in accordance with the terms of the 1975 Contract.

208. The contractual obligation, under the 1975 Contract, to fund improvements to the HWG WS is a local obligation of the HWG WS users or the Village.

209. That contrary to, and in violation of, the terms of the 1975 Contract, regarding the local HWG WS obligation to fund improvement to the WS, on May 29, 2008 certain HWG area residents filed a lawsuit against the County, which purports to assert a claim that the County should be held responsible for payment of any HWG WS improvements.

210. That the failure or refusal by HWG WS users, or of the Village, to pay for (retire) revenue bonds, issued for construction of a new Code-compliant public WS, from funds derived from the local HWG WS or HWG area, constitutes a breach of contract.

211. That there is a controversy, and a declaration of the rights of the parties under the 1975 Contract is necessary for there to be a complete resolution of the HWG WS issues, including those issues relating to the local system funding of revenue bonds for construction of a new public WS serving the HWG area, and to fix the source of local funding (whether by a County surcharge on HWG WS users' water bills, or some other local system source by the Village) to provide the construction funding for the new HWG WS, which would permanently abate the non-compliance with IEPA public water system standards, which is sought by the State in the underlying lawsuit.

WHEREFORE, Third-Party Plaintiff COUNTY OF LAKE prays that this Honorable Court enter a declaration of the rights and obligations under the 1975 Contract, and find that:

a) the retirement of subordinate revenue bonds, issued by the County to fund construction of the new HWG WS, through a surcharge to HWG WS users' water bills, is lawful and appropriate under the terms of the 1975 Contract; and,

b) declare that in the event the County cannot surcharge HWG WS users' water bills to raise revenues from the HWG area to retire revenue bonds issued to fund construction of a

new public WS in the HWG area, that the Village shall be obligated to provide a revenue

source to retire such revenue bonds; or,

c) that the Court declare that, as a result of the Village's, or HWG WS users', breach

of the 1975 Contract by failing or refusing to fund system improvements from a local system

source, the County has no obligation to perform under the 1975 Contract and/or that the 1975

Contract is void; and,

d) for such other or different relief as the Court deems just and equitable under the

circumstances.

## COUNT IV
### 1975 Contract Termination, Returning the HWG WS to Village

212-265.  Alternatively, Third-Party Plaintiff County adopts as if fully set forth herein

Paragraphs 37- 90 of Count I above as Paragraphs 212 – 265 of this Count IV.

266.  That the 1975 Contract contains no term, and therefore a reasonable term is

implied by law for the 1975 Contract.

267. That the County has performed its operation and ownership obligations under

the 1975 Contract, to the extent permitted by the Village and HWG area residents, for a

period of time now approaching 33 years.   That time period is a reasonable contract term.

268.  That the Village now has another public water supply system, other than the

HWG WS, operating within Village boundaries, and the County is informed and believes that

the Village now has Village Fire Ordinance requirements that are more stringent than

minimum State public water supply requirements.

269. That by reason of the foregoing, the Village now possesses the ability as well as the authority to operate the HWG WS.

270. That, by reason of the foregoing, and the Village's breach of the 1975 Contract by its failure or refusal to allow the County to construct and install and operate an IEPA-approved public water supply in the HWG area, and, further, the lack of an agreed local revenue source to pay for the construction and installation of a County-owned and operated, IEPA approved, public water supply system in the HWG area, as contemplated in the 1975 Contract, the County has no further obligation to operate or own the HWG WS, and that the HWG WS can and should therefore by returned to the ownership and operation of the Village.

WHEREFORE, alternatively, Third-Party Plaintiff COUNTY OF LAKE respectfully prays that this Court enter an Order declaring, that the 32+ years term of the 1975 Contract between the County and the Village is a reasonable and complete term for that operation and ownership of the HWG WS within the municipal boundaries of the Village; that the 1975 Contract between the County and Village has now terminated; that the Village has another public water supply system operating within Village municipal boundaries, and that the Village has the ability and the authority to operate the HWG WS; and, therefore, that the ownership and operation of the HWG WS can and should henceforth be transferred from the County to the Village; and, for such other or different relief as the Court deems just and equitable under the circumstances.

21

COUNTY OF LAKE, Illinois

MICHAEL J. WALLER,
State's Attorney of Lake County

By: _____
James C. Bakk
Special Assistant State's Attorney

By: _____
Daniel L. Jasica
Assistant State's Attorney

James C. Bakk (# 3121531)
Special Assistant State's Attorney
200 N. M.L. King Ave., Suite 206
Waukegan, IL 60085
(847) 249-9900

Daniel L. Jasica
Assistant State's Attorney
18 N. County Street
Waukegan, IL 60085
(847) 377-3101



## U.S. Census Bureau
### American FactFinder

FACT SHEET

## Lake County, Illinois

**2006 American Community Survey**
**Data Profile Highlights:**

NOTE. Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

| Social Characteristics - show more >> | Estimate | Percent | U.S. | Margin of Error |
|---|---|---|---|---|
| Average household size | 2.98 | (X) | 2.61 | +/-0.03 |
| Average family size | 3.52 | (X) | 3.20 | +/-0.06 |
| Population 25 years and over | 445,282 | | | +/-640 |
| High school graduate or higher | (X) | 87.7 | 84.1% | (X) |
| Bachelor's degree or higher | (X) | 40.6 | 27.0% | (X) |
| Civilian veterans (civilian population 18 years and over) | 40,485 | 8.0 | 10.4% | +/-2,473 |
| Disability status (population 5 years and over) | 61,251 | 9.5 | 15.1% | +/-4,274 |
| Foreign born | 131,707 | 18.5 | 12.5% | +/-6,548 |
| Male, Now married, except separated (population 15 years and over) | 152,056 | 55.4 | 52.4% | +/-3,653 |
| Female, Now married, except separated (population 15 years and over) | 150,592 | 54.8 | 48.4% | +/-4,345 |
| Speak a language other than English at home (population 5 years and over) | 188,970 | 28.6 | 19.7% | +/-6,283 |
| Household population | 695,783 | | | +/-495 |
| Group quarters population | (X) | (X) | (X) | (X) |

| Economic Characteristics - show more >> | Estimate | Percent | U.S. | Margin of Error |
|---|---|---|---|---|
| In labor force (population 16 years and over) | 384,822 | 71.5 | 65.0% | +/-4,885 |
| Mean travel time to work in minutes (workers 16 years and over) | 30.6 | (X) | 25.0 | +/-0.7 |
| Median household income (in 2006 inflation-adjusted dollars) | 75,170 | (X) | 48,451 | +/-1,970 |
| Median family income (in 2006 inflation-adjusted dollars) | 86,391 | (X) | 58,526 | +/-2,459 |
| Per capita income (in 2006 inflation-adjusted dollars) | 35,058 | (X) | 25,267 | +/-880 |
| Families below poverty level | (X) | 4.0 | 9.8% | (X) |
| Individuals below poverty level | (X) | 5.6 | 13.3% | (X) |

| Housing Characteristics - show more >> | Estimate | Percent | U.S. | Margin of Error |
|---|---|---|---|---|
| Total housing units | 250,631 | | | +/-181 |
| Occupied housing units | 233,322 | 93.1 | 88.4% | +/-2,068 |
| Owner-occupied housing units | 187,358 | 80.3 | 67.3% | +/-2,887 |
| Renter-occupied housing units | 45,964 | 19.7 | 32.7% | +/-2,664 |
| Vacant housing units | 17,309 | 6.9 | 11.6% | +/-2,075 |
| Owner-occupied homes | 187,358 | | | +/-2,887 |
| Median value (dollars) | 281,900 | (X) | 185,200 | +/-7,774 |
| Median of selected monthly owner costs | | | | |
| With a mortgage (dollars) | 1,966 | (X) | 1,402 | +/-29 |
| Not mortgaged (dollars) | 728 | (X) | 399 | +/-33 |

| ACS Demographic Estimates - show more >> | Estimate | Percent | U.S. | Margin of Error |
|---|---|---|---|---|
| | | | | ***** |
| Total population | 713,076 | | | |
| Male | 358,494 | 50.3 | 49.2% | +/-292 |



Ex. E

| | | | |
|---|---|---|---|
| Female | 354,582 | 49.7 | 50.8% | +/-292 |
| Median age (years) | 34.7 | (X) | 36.4 | +/-0.1 |
| Under 5 years | 51,440 | 7.2 | 6.8% | +/-99 |
| 18 years and over | 515,016 | 72.2 | 75.4% | ***** |
| 65 years and over | 64,464 | 9.0 | 12.4% | +/-84 |
| One race | 700,323 | 98.2 | 98.0% | +/-2,342 |
| White | 572,590 | 80.3 | 73.9% | +/-6,360 |
| Black or African American | 46,698 | 6.5 | 12.4% | +/-1,655 |
| American Indian and Alaska Native | 789 | 0.1 | 0.8% | +/-377 |
| Asian | 40,679 | 5.7 | 4.4% | +/-1,401 |
| Native Hawaiian and Other Pacific Islander | 38 | 0.0 | 0.1% | +/-56 |
| Some other race | 39,529 | 5.5 | 6.3% | +/-6,213 |
| Two or more races | 12,753 | 1.8 | 2.0% | +/-2,342 |
| Hispanic or Latino (of any race) | 133,422 | 18.7 | 14.8% | ***** |

Source: U.S. Census Bureau, 2006 American Community Survey

Explanation of Symbols:
'***' - The median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.
'*****' - The estimate is controlled. A statistical test for sampling variability is not appropriate.
'N' - Data for this geographic area cannot be displayed because the number of sample cases is too small.
'(X)' - The value is not applicable or not available.

The letters PDF or symbol ⚛ indicate a document is in the Portable Document Format (PDF). To view the file you will
need the Adobe® Acrobat® Reader, which is available for **free** from the Adobe web site.